635 F.2d 1020
 NATIONAL CITY TRADING CORP., Ira J. Sands, and Michel Gharbi
Caradimitropoulo, Petitioners-Appellants,
v.
UNITED STATES of America and the United States Attorney for
the Southern District of New York, Respondents-Appellees.
 No. 159, Docket 80-6093.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 2, 1980.
Decided Nov. 28, 1980.
 
 Lawrence S. Bader, New York City (Marvin B. Segal, Edward M. Chikofsky, Segal & Hundley, New York City, of counsel), for petitioners-appellants.
 Lesley Oelsner, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty. for the Southern District of New York, Richard F. Ziegler, Asst. U. S. Atty., New York City, of counsel), for respondents-appellees.
 Before OAKES and NEWMAN, Circuit Judges, and COFFRIN, District Judge.*
 OAKES, Circuit Judge:
 
 
 1
 This appeal is from a judgment of the United States District Court for the Southern District of New York, Pierre N. Leval, Judge, denying a petition by National City Trading Corporation (NCTC), Ira J. Sands (Sands), and Michel Gharbi Caradimitropoulo (Gharbi) under Federal Rule of Criminal Procedure 41(e) for the return of property seized pursuant to a search warrant for the premises at Suite 333, 515 Madison Avenue, New York, New York. The appellants urge that the warrant's description of the place to be searched a business suite including an attorney's office was insufficiently particular; that the warrant did not satisfy the Fourth Amendment's requirement of "reasonableness," see Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973); and that the warrant's description of the items to be seized was insufficiently particular. These objections are without merit and we affirm the judgment below.
 
 FACTS
 
 2
 The warrant here, issued by Magistrate Nina Gershon, authorized the search of the premises in question for evidence and instrumentalities of violations of 7 U.S.C. § 6b(2) (antifraud provisions of the Commodity Exchange Act), 7 U.S.C. § 6c(c) (unlawfully engaging in transactions in commodity options), 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), and 18 U.S.C. § 371 (conspiracy to commit the foregoing offenses). According to the warrant, the evidence consisted of
 
 
 3
 property of National City Trading Corp. and persons associated with it, to wit, customer files, customer lists, personnel files, financial records, banking records including cancelled checks, telephone records, correspondence, mail and telegram records, sales literature, contracts, tape recordings, calendars, diaries, silver bullion and a "Polaroid" type photograph of a middle-aged man seated at a desk on which appears several-colored bars.
 
 
 4
 FBI agent William M. Mackey, who had investigated about twenty of the forty or so complaints received from NCTC customers, filed an affidavit in support of the search warrant. The affidavit fully described the operations of NCTC.
 
 
 5
 Gharbi was president of NCTC and Sands was serving as counsel at the time of the search. NCTC stock was wholly owned by Gharbi's wife and Sands's wife, and the company's offices were in Suite 333, though the name on the main door to the suite was only that of Ira J. Sands. NCTC employed a number of salesmen to conduct telephone solicitations and sales in which members of the public, believing they were buying a classic commodity option, were in fact being defrauded of substantial sums of money in connection with the trading of silver. Working by telephone, NCTC sales representatives solicited investments from potential customers throughout the United States. They advised customers that for a fixed, nonrefundable service fee or premium, paid at the outset of the transaction, the purchaser would have the right to buy a fixed amount of a commodity such as silver, at a fixed future time, at a fixed price, irrespective of any rise in price in the interval. Thus the customer was assured of a profit if the price of the commodity rose enough during the interval to cover the service fee.
 
 
 6
 The sales representatives told the customer that he would not have to pay anything more when the contract matured, and NCTC would simply send him a check for the difference between the price quoted at the time of the transaction and the price to which the commodity had risen. The service fee, however, had to be paid immediately. After receipt of a customer's money, NCTC sent out a "purchase confirmation slip," on the reverse side of which the fine print advised the customer that he had to take actual delivery of the commodity and implied that he would indeed have to pay the full purchase price. Mailgrams sent just before the maturity date were even more explicit, stating that the purchase price had to be paid on the maturity date of the contract even though the commodity would not be delivered until five days thereafter and that customers must also pay the 8% New York City sales tax. Some mailgrams advanced the maturity date of the contracts.
 
 
 7
 As a result of these practices, people who were unwilling or unable to pay the full purchase price of the commodity (the service fee was only a small percentage of the full price) forfeited the initial fee that they had paid to NCTC. But even NCTC customers who were willing to pay the full amount and take delivery of the commodity usually lost their initial payments because, when they tendered the full purchase price to NCTC, they were informed that they were too late NCTC had unilaterally advanced the payment date. For example, one customer, accompanied by agent Mackey in an undercover capacity, was prepared to tender the full purchase price to NCTC but was informed by Sands, who identified himself as NCTC counsel, that he was too late the date on which the customer was required to pay had been advanced by one week to the day of the visit and, because the banks had already closed for the day, the customer had defaulted on his contract, losing both his service fee and his right to profit from the appreciation in the price of silver during the period of the contract.
 
 
 8
 Another customer, also accompanied by an agent, had a December 5, 1979, maturity date. By mailgram on November 26 NCTC had accelerated the maturity date to November 28. The customer tendered a cashier's check for the purchase price, but this was rejected by Gharbi on the basis that payment on it could be stopped. Then, when Gharbi discovered the November 28 "revised" maturity date, he refused to return the service fee on the ground that to do so would violate regulations of the Commodities Futures Trade Commission. Only when the undercover agent suggested that Gharbi might be committing a crime did Gharbi refund the service fee.
 
 
 9
 A third customer, once again accompanied by an agent, had bought for a service fee of $1,080 a silver contract in September 1979 permitting him to control 1,000 ounces for four months. When advised that he would have to pay the full purchase price of over $15,000 if he wished to realize his profit, yet would have to wait until five days after payment to receive the silver, the customer decided not to risk the additional money and had to forego his service fee and the interim price appreciation.
 
 
 10
 The affidavit also described the physical layout of the NCTC premises. Offices within the suite were located on both sides of a central corridor which began at the end of the reception area. Down the corridor, after a left ninety-degree turn, two agents had been received with the customers they accompanied in a corner room with a red filing cabinet in which an NCTC representative had searched to find the customers' file folders. The room also had two telephones, each on a desk, as well as printed documents bearing the NCTC name. The third agent had met with Gharbi in one of two rooms to the left of the main corridor. The rooms were apparently connected and used as a law library. In one of these rooms agent Mackey observed two rows of five or six desks, with a telephone on each, giving the appearance of the typical telephone "boiler room." As for the fact that only Sands's name was on the outer door of the suite, Gharbi told one agent that NCTC obtained its office space free because Mrs. Sands was a stockholder.
 
 
 11
 Following the issuance of the warrant, agent Mackey prepared a memorandum regarding the contemplated search of Suite 333, a copy of which was given to each of the twenty-five agents assigned to participate in the search. The memorandum read as follows:
 
 RE: NATIONAL CITY TRADING COMPANY
 SUITE 333
 515 MADISON AVENUE
 NEW YORK, NEW YORK
 
 12
 Captioned company involved in selling fraudulent commodities contracts. On instant date, a search warrant was issued by US Magistrate, SDNY, for the premises of Suite 333, 515 Madison Ave. regarding the operation of National City Trading Company.
 
 
 13
 It is noted that National City Trading Company's offices are contained in a Suite of law offices belonging to attorney IRA J. SANDS. Although SANDS is the Corporate Attorney for NCTC, the search will only concern NCTC and not SANDS general law practice. We have authority to search the entire suite of offices. However, every effort should be made to avoid disrupting SANDS general law practice.
 
 
 14
 Beyond this, an Assistant United States Attorney instructed the agents on how the search warrant was to be executed and told them not to seize any documents that did not pertain to NCTC or to search any briefcases or bags of persons not associated with NCTC. The attorney further directed the agents, first, to secure each room within Suite 333; then to search the "boiler room," Gharbi's office, the controller's office, and Sands's office; and finally to search any other office which a cursory examination indicated might be connected to NCTC and to leave alone those offices which had no such connection.
 
 
 15
 Although appellants originally sought a hearing on whether the search had been properly conducted, they waived it when Sands was unavailable and they did not seek a continuance. There is nothing in the record, therefore, to indicate that the search was conducted in any manner, shape, or form differently from the directions set forth in agent Mackey's memorandum or the oral instructions of the Assistant United States Attorney. NCTC records were found in ten different rooms within the suite, which had a total of some eighteen rooms in addition to the lobby. Appellant Sands was not present when the agents showed up at Suite 333, and the agents did not enter his personal office until after he arrived at the suite. The agents did not search any of the closed file cabinets in his office but did see a file in an open drawer bearing the name of an NCTC salesman, which Sands handed over. The agents also asked Sands to produce the NCTC legal records, and he gave them one such file. The agents sealed this file without inspecting it, and the Government furnished Sands and Gharbi with copies of all materials seized.
 
 
 16
 Sands, Gharbi, and NCTC subsequently petitioned the district court, pursuant to Federal Rule of Criminal Procedure 41(e),[1] for return of the seized property. Judge Leval heard oral argument on the matter, decided that the warrant and search had been proper, and denied the petition.
 
 DISCUSSION
 
 17
 Appellants first argue that the warrant's description of the place to be searched does not satisfy the requirement of the Fourth Amendment that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched ...." This argument is one of overbreadth: appellants claim that probable cause, as set forth within the four corners of the affidavit, related only to the activities of NCTC and, therefore, the search of the entire suite, which supposedly was a law office, was unlawful. Appellants analogize to cases involving multi-unit apartment houses or dwellings, such as United States v. Votteller, 544 F.2d 1355, 1362-64 (6th Cir. 1976), and United States v. Bermudez, 526 F.2d 89, 96-97 (2d Cir. 1975), cert. denied, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976), in which the courts have required that the warrant identify with specificity the unit to be searched. And, the argument runs, a warrant permitting a search of the entire suite is a general warrant, condemned as such to the present day, e. g., Stanford v. Texas, 379 U.S. 476, 481, 85 S.Ct. 506, 509, 13 L.Ed.2d 431 (1965).
 
 
 18
 But there was no demarcation within Suite 333 between the rooms occupied by NCTC and those occupied by the law office. From what the agent had observed, various rooms in the suite were being utilized for the operations of NCTC; what appeared to the agents to be a law library-at least it contained law books-was used as the boiler room for telephoning potential customers. And the president of NCTC occupied a corner office. As execution of the warrant was to prove, even though NCTC supposedly occupied but three rooms in the suite, NCTC records were to be found in ten rooms. In short, the space utilized by the law office on the one hand and the business operation on the other was for all intents and purposes commingled. As such the entire suite, really being one set of offices, was properly subject to search for NCTC books and papers, just as the warrant indicated. The Fourth Amendment's requirement of particularity was satisfied because "(i)t is enough if the description is such that the officer(s) armed with a search warrant can with reasonable effort ascertain and identify the place intended." Steele v. United States, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925) (garage business on first floor and storage business above, under one lease, were of such character and so related to the elevator that there was no real division in fact or in use of the building; thus upstairs could be searched even though agents had seen whiskey only in garage).
 
 
 19
 Here, as in Steele, the description of the NCTC premises as Suite 333 correctly indicated the entire suite as the place intended to be searched. See also United States v. Santore, 290 F.2d 51, 66-67 (2d Cir. 1959) (warrant describing premises as one-family house was proper, even though it actually a two-family house, when outward appearances and local registration indicated only a one-family dwelling), aff'd in part, 290 F.2d 74 (2d Cir. 1960) (en banc), cert. denied, 365 U.S. 834, 81 S.Ct. 745, 5 L.Ed.2d 743 (1961). As we stated long ago in United States v. Fitzmaurice, 45 F.2d 133, 135 (2d Cir. 1930), we are concerned primarily with the "practical accuracy" of the description of the premises to be searched. Sands's authorization of the indiscriminate use of his law office for the commodity trading of NCTC prevented the agents from describing the area to be searched with any further degree of accuracy than that set forth in the affidavit and the warrant. The fact that this was a law office is thus wholly coincidental.
 
 
 20
 The commingling of space here also distinguishes this case from others such as Votteller, 544 F.2d at 1362-64, and Bermudez, 526 F.2d at 96-97, involving multi-unit apartment houses or dwellings. Indeed, appellants' own brief demonstrates the fallacy of their position when it states that the following principle may be gleaned from these cases: "(W)hen the Government knows or reasonably should know that a particular area contains identifiable separate subunits some of which are owned or controlled by unrelated persons against whom no probable cause is shown, (in the absence of common occupancy of each such subunit) a search warrant may not authorize the search of any such unrelated subunit absent a showing of probable cause to believe that evidence or instrumentalities of a crime will be found in each particular subunit to be searched," Brief for Appellants at 17-18. Suite 333 simply did not contain "identifiable separate subunits." Cf. United States v. Gusan, 549 F.2d 15, 19 (7th Cir.) (upholding search warrant covering more than one apartment where defendant's exercise of dominion over otherwise vacant apartment not his own was a regular occurrence), cert. denied, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977).
 
 
 21
 The appellants' second contention, a variation on the theme of the first, goes to the "reasonableness" of the search. Rather than asserting that the Mackey affidavit failed to establish probable cause for believing that evidence of NCTC's criminality would be found in Sands's law office, the argument now is that the search was unreasonable because it involved a law office absent probable cause to believe that the lawyer in question had committed a crime. Appellants call attention to the fact that Sands had other clients, and that the warrant permitted the search of privileged communications with these clients.
 
 
 22
 But appellants address themselves only to the situation in which a warrant is issued to search a lawyer's office to obtain evidence of a client's criminal activity from the client's file. See O'Connor v. Johnson, Minn., 287 N.W.2d 400 (1979); Deukmejian v. Superior Court, 103 Cal.App.3d 253, 162 Cal.Rptr. 857 (Ct.App.1980). Totally distinguishing this case from O'Connor and Deukmejian is the fact that here the lawyer actually permitted the allegedly criminal business operation to take place at his office.[2] Appellants concede that there was probable cause to believe that members of NCTC were violating the mail fraud and commodities trading laws. Suite 333 was the only location of NCTC's operation, and there is nothing more sacred about a law office used for business purposes-indeed some would suggest for First Amendment reasons quite the contrary-than there is about the premises of a newspaper. Of course, in the latter instance, the Supreme Court has upheld the use of a warrant to search and seize evidence. See Zurcher v. Stanford Daily, 436 U.S. 547, 554, 98 S.Ct. 1970, 1975, 56 L.Ed.2d 525 (1978) ("valid warrants may be issued to search any property, whether or not occupied by a third party, at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found").[3] Although a law office search should be executed with special care to avoid unnecessary intrusion on attorney-client communications, it is nevertheless proper if there is reasonable cause to believe that the specific items sought are located on the property to be searched, see Zurcher, 436 U.S. at 556, 98 S.Ct. at 1977. Beyond this, we emphasize again the commingling of the activities involved here. Judge Leval stated it as well as we could: "(A) criminal enterprise does not exempt itself from a search warrant by conducting its business and keeping its records in its lawyer's office."
 
 
 23
 The appellants' third argument is that the warrant insufficiently described "the things to be seized." Appellants remind us of the broad statement in Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927), that "(a)s to what is to be taken, nothing is left to the discretion of the officer executing the warrant." The warrant here is said to be deficient in three respects: it authorized seizure of (1) privileged communications between NCTC and Sands, and Sands's work product in connection with NCTC matters; (2) property merely belonging to a person "associated" with NCTC but wholly unrelated to NCTC's operations; and (3) property of NCTC for which there was no showing of probable cause in the affidavit.
 
 
 24
 As to the point that the warrant authorized seizure of privileged communications between NCTC and Sands as well as Sands's work product in connection with NCTC matters, we begin by again noting that there was probable cause to believe that NCTC's business was permeated with fraud. Accordingly, the agents could properly seize all of the business records of NCTC described in the warrant. See United States v. Brien, 617 F.2d 299, 309 (1st Cir. 1980), cert. denied, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980). Turning to Sands, as lawyer-lessor of NCTC and husband of a principal stockholder, his activities were significantly intermingled with those of the company. Indeed, Sands had even held a discussion with an NCTC customer culminating in the customer's loss of his "investment." Therefore, the agents also had probable cause for making Sands's files on NCTC a target for search. Although the warrant may have encompassed privileged materials, the same was doubtless true of the warrants directed at the law office in Andresen v. Maryland, 427 U.S. 463, 482-84, 96 S.Ct. 2737, 2748-50, 49 L.Ed.2d 547 (1976). And the warrant here was as specific if not more so than those deemed "models of particularity" in Andresen, id. at 479-82, 96 S.Ct. at 2748-49 (upholding warrant permitting search of a lawyer's office for, among other things, "books, records, documents, papers, memoranda and correspondence" relating to a fraudulent transaction). To the extent that the files obtained here were privileged, but see In re Doe, 551 F.2d 899 (2d Cir. 1977); Union Camp Corp. v. Lewis, 385 F.2d 143 (4th Cir. 1967), the remedy is suppression and return of the documents in question, not invalidation of the search, see Andresen, 427 U.S. at 482 n.11, 96 S.Ct. at 2749 n.11; United States v. Dunloy, 584 F.2d 6, 11 n.4 (2d Cir. 1978); VonderAhe v. Howland, 508 F.2d 364, 372 (9th Cir. 1974).
 
 
 25
 In this connection, and being aware of the "grave dangers" inherent in executing a warrant authorizing a search and seizure of papers, Andresen, 427 U.S. at 482 n.11, 96 S.Ct. at 2749 n.11, we note with approval the care taken by the Government in the search involved here. That care was evidenced not only by agent Mackey's memorandum of instructions and by the directions of the Assistant United States Attorney, but also by the fact that the agents did not search Sands's office until he was present, they did not examine closed files, and they sealed the "legal" file seized. Such self-regulatory care is conduct highly becoming to the Government; some would suggest that these police-made rules go to the heart of the Fourth Amendment, see generally Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 416-29 (1974); United States v. Barbera, 514 F.2d 294, 301-04 (2d Cir. 1975). It surely is in no way harmful to the Government's position here.
 
 
 26
 The argument that the warrant could be interpreted as authorizing seizure of property from persons "associated" with NCTC even if the property did not pertain to NCTC's fraud simply does not represent a "common-sense and realistic" reading of the warrant, see United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). Appellants also point out that the phrase "persons associated with (NCTC)" left the executing officers without any guidance as to the identity of those individuals. We find this equally unpersuasive. While it might have been preferable to identify anyone associated with NCTC whose name was known, it was obvious in view of the number of desks and the apparent size of the operation that some unknown persons associated with NCTC would be present at the time of the search. We do not believe that the appellants' proposed standard represents a reasonable approach to the mandates of the Fourth Amendment. See United States v. Abrams, 615 F.2d 541, 550-51 (1st Cir. 1980) (Campbell, J., concurring).
 
 
 27
 The final point made by appellants is that the Government failed to establish probable cause to believe that either the silver bullion or the Polaroid photograph of a man behind a desk on which appear several silver-colored bars were in any way connected with the scheme to defraud NCTC customers. There was, of course, probable cause to suppose that these items were in Suite 333; they were seen there, according to paragraph 17 of the affidavit, by one of the undercover agents. But there was also probable cause to believe that these items were evidence of the fraud: Both Gharbi and an NCTC salesman told agents that customers had successfully come to claim their silver and that the picture was of one such "satisfied customer," yet one agent, when shown a photograph of Sands, thought it "likely" that the "customer" was Sands himself. Thus, we find no merit to these exceptions by appellants to the warrant.
 
 
 28
 Judgment affirmed.
 
 
 
 *
 Of the District Court of Vermont, sitting by designation
 
 
 [1]
 Fed.R.Crim.P. 41(e) provides, in relevant part:
 A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property on the ground that he is entitled to lawful possession of the property which was illegally seized. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored and it shall not be admissible in evidence at any hearing or trial....
 
 
 [2]
 Also weakening the persuasive authority of these two cases is the fact that the court in O'Connor recognized that its decision went beyond the requirements of the Fourth Amendment and it therefore explicitly based its holding on the Minnesota Constitution, see 287 N.W.2d at 405; and the court in Deukmejian, noting that search warrants directed at law offices are not per se "unreasonable," did not have to decide this Fourth Amendment issue because the California legislature, while the case was pending, had provided a special procedure for performing searches of law offices, see 103 Cal.App.3d at 258-60, 162 Cal.Rptr. at 860-62
 
 
 [3]
 The fact that Congress has now enacted the Privacy Protection Act of 1980, Pub.L.No.96-440, 94 Stat. 1879 (Oct. 13, 1980), which limits the circumstances under which documentary material may be seized from journalists and authors, does not affect the Supreme Court's interpretation of the requirements of the Fourth Amendment in Zurcher