**UNITED STATES of America**

v.

**William A. HUNTER.**

**No. 2:97–CR–059.**

United States District Court, D. Vermont.

June 10, 1998.

577

James J. Gelber, Paul J. Van de Graaf, Office of U.S. Atty., Dist. Vt., Burlington, VT, for U.S.

David Alan Gibson, Brattleboro, VT, for defendant.

*OPINION AND ORDER*

SESSIONS, District Judge.

Defendant William A. Hunter ("Hunter") has filed a motion to suppress the evidence and the fruits thereof obtained from a search of his house at approximately 4 a.m. on June 9, 1995. Hunter challenges the constitutionality of the warrant and its execution on several grounds: (1) the warrant was not supported by probable cause; (2) a nighttime search was unreasonable; (3) the warrant was impermissibly overbroad; and (4) the warrant was executed improperly .[1] For the

---

1. The Defendant also claimed that the law enforcement officers who sought the warrant presented information to the magistrate judge knowing it to be false or made with reckless disregard for the truth, necessitating a *Franks* hearing. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). This claim is addressed in a separate opinion.

**578**

reasons that follow, Hunter's motion is denied.

### Factual Background

In early 1995, agents of the Drug Enforcement Administration ("DEA") conducted an investigation into the illegal drug activities of Frank Sargent. During the course of their investigation, agents spoke with a confidential source who stated that she was aware of a meeting among Sargent, Gloria Radcliffe, and Sargent's lawyer, William A. Hunter. The source told the investigators that Hunter laundered money for Sargent, and that the purpose of the meeting was to collect a drug debt from Radcliffe.

On June 8, 1995, DEA agents arrested Sargent and his sister Lazzell Merrill on drug charges. Both Sargent and Merrill agreed to cooperate with the government. On the evening of June 8, Sargent told the agents that Hunter was aware of Sargent's drug activities and that Connecticut Realty Trust ("CRT"), a corporation managed by Hunter, was used to launder proceeds of drug transactions. He said that Hunter invested money with him and that Hunter knew Sargent used the funds to buy drugs. He stated that in fact Hunter had given him $15,000.00 that day, for which Sargent provided a receipt. Sargent also stated that Hunter kept CRT's records at his law office located at his residence.

Merrill told investigators that she had been at meetings between Hunter and Sargent, from which she understood that Hunter invested money with Sargent, and that Hunter knew that the funds were to be used to buy drugs.

The agents applied for a warrant to search Hunter's residence and law office that same evening. They requested authorization to search for documents and records pertaining to specific individuals, business entities and real estate, and to seize all computers, computer storage devices and software for search at a later date by FBI computer experts. They also requested authorization for an immediate search, based on concern that evidence might be destroyed once it was learned that Sargent and Merrill had been arrested.

To minimize invasion of materials protected by attorney-client privilege, lawyers within the United States Attorney's Office designed a protocol for execution of the warrant. Two agents from the United States Customs Service were to handle the search in the presence of an Assistant United States Attorney ("AUSA"). None of these individuals were to have had any previous involvement in the investigation. The AUSA was to be present to resolve any questions about whether an item was subject to seizure. No law enforcement personnel other than the search team and the AUSA were to be inside the premises during the search.

Magistrate Judge Jerome J. Niedermeier signed the warrant at 12:59 a.m. The search team, accompanied by three DEA agents, arrived at the Hunter residence at approximately 4:00 a.m. They knocked, identified themselves to Hunter and presented the warrant. One Customs agent and one DEA agent conducted a security sweep of the house, checking each room of the house by flashlight. Following the security sweep Hunter assisted the agents in searching his basement law office. The dining room area also was searched. Hunter collected the specific files sought and handed them over to one of the Customs agents. The search team also seized checks and check registers, three computers and numerous computer disks.

Although the protocol specified that no DEA agents would be present during the search, it is undisputed that in fact DEA agents were inside the house during the search. Two DEA agents questioned Hunter about his knowledge of the matter under investigation. The search team and the AUSA were not shown a copy of the protocol, and were unaware of the restriction on DEA's presence. Government witnesses testified that the DEA agents were on the premises to provide security only, and that they did not participate in the search. They admitted that DEA agent Thomas Doud activated one of Hunter's computers, at the direction of AUSA Gregory Waples, in order to download some files unrelated to the investigation that Hunter needed for his work.

According to the defense, the DEA agents were much more actively involved in the search. Hunter testified that a DEA agent questioned him about the location of an item he wanted to seize; that a DEA agent decided whether a particular computer was going to be seized; and that a DEA agent seized a quantity of computer disks in the course of the search.

### Discussion

The search of Hunter's home and office was unique in this jurisdiction because of its subject and its scope. Two areas of concern intersect here: the search and seizure of law office records and that of computer equipment and data.

### I. *Probable Cause*

■ The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. Am. IV. A search pursuant to a warrant is reasonable if application for the warrant was made to a neutral, detached magistrate, who found the search justified by probable cause. Hunter contends that the search was unreasonable because (1) the government lacked probable cause for a search of his office; (2) the government lacked probable cause for a search of his residence; and (3) the government lacked probable cause for a nighttime search.

The Supreme Court has stated that probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). A magistrate makes "a practical, commonsense decision" whether under the totality of the circumstances "there is a fair probability that ... evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238, 103 S.Ct. 2317. A reviewing court should accord "great deference" to the magistrate's decision, *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996), and should uphold the warrant as long as the magistrate had a "substantial basis for ... conclud[ing] that a search would uncover evidence of wrongdoing." *Gates,* 462 U.S. at 236, 103

S.Ct. 2317, (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), *overruled on other grounds by United States v. Salvucci,* 448 U.S. 83, 84, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980)).

### A. *Search of Hunter's office*

■ Law offices are not immune from search. " '[A] criminal enterprise does not exempt itself from a search warrant by conducting its business and keeping its records in its lawyer's office.' " *National City Trading Corp. v. United States,* 635 F.2d 1020, 1026 (2d Cir.1980) (quoting District Court opinion, 487 F.Supp. 1332, 1336 (S.D.N.Y. 1980)). The Second Circuit, in this case involving an attorney as suspect, noted that "special care" should be taken to avoid intruding on attorney-client communications, but held that search of a law office is proper given "reasonable cause" to believe that the items sought are on the property. *Id.*

■ According to Hunter, the warrant lacked probable cause because Hunter was not a suspect, nor was there any basis for him to be one. The government disagrees, pointing to the supporting affidavits for the warrant, which implicated Hunter as a knowing participant in illegal dealings with Sargent. The supporting affidavits submitted with the search warrant application supplied the following information.

### 1. *The Cole affidavit*

DEA agent Charles J. Cole's affidavit stated that after his arrest Sargent told investigators that he had known Hunter for two years and that he was recently involved with Hunter in CRT. Sargent said that CRT was established by Hunter for the purpose of investing the proceeds of drug trafficking, and that Hunter was its president. Sargent also told the investigator that he had received substantial sums of money from Hunter or through Hunter, as recently as the morning of his arrest, when Hunter gave him $15,000.00. Sargent said that when he received money from Hunter he gave Hunter a receipt, which Hunter kept in a file folder. Sargent had been to Hunter's office and seen

the file folder there. He believed that Hunter rarely took the file out of the office.

## 2. *The Bradley affidavit*

DEA agent James Bradley's affidavit pieced together from four confidential informants that Sargent was investing in real estate with the proceeds from his drug dealing, that Sargent's lawyer was handling the transactions, that Hunter was Sargent's lawyer, and that Sargent met with Hunter regularly. One of the confidential informants also described a meeting in November 1994 among Hunter, Sargent and Gloria Radcliffe, a drug customer of Sargent's who had run up a large debt. Hunter told Radcliffe that he handled Sargent's finances, and Sargent told Radcliffe that Hunter washed Sargent's money. Radcliffe was to receive an insurance settlement. Radcliffe and Hunter signed an agreement that Radcliffe would direct her attorney to pay $60,000.00 from the settlement proceeds to CRT as an investment in real estate, for which she would receive back a mortgage. Bradley's theory was that Hunter was serving as Sargent's drug debt collector, and that the agreement ensured that Radcliffe would pay her drug debt and provided a legitimate reason for the money to change hands.

Bradley ascertained that CRT was registered as a Vermont corporation, with Hunter as its registered agent. Through land records research he found a connection between CRT and Hammondsville Environmental Forestry Associates ("HEFA"), another Hunter company. He also found that Sargent and CRT were linked to several parcels of real estate in Windsor, Vermont.

■ Although the "two-pronged test" for determination of probable cause, derived from the cases of *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), has been abandoned in favor of a "totality of the circumstances" approach, "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant" still. *Gates,* 462 U.S. at 230, 103 S.Ct. 2317. Cole's affidavit supplied information he received from Sargent after his arrest. The basis of Sargent's

knowledge was his association with Hunter and firsthand observation. As to Sargent's credibility, his statements were against penal interest. *See United States v. LaMorie,* 100 F.3d 547, 553 (8th Cir.1996) (statements against penal interest of an informant carry considerable weight, citing *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971)). *But see Harris,* 403 U.S. at 583–84, 91 S.Ct. 2075 (conceding that admissions of criminal conduct do not always lend credibility to informant's contemporaneous accusations of another). Sargent's information was also corroborated: by his sister, who was involved with Sargent in drug distribution; by the information from confidential sources, notably the description of the meeting among Sargent, Hunter and Radcliffe; and by the verification of Hunter's involvement with CRT.

The magistrate's finding of probable cause was justified. Hunter's role as Sargent's business lawyer, Hunter's substantial presence in CRT's affairs, his active presence at the meetings described by Sargent and a confidential informant, and Sargent's statement that records of the transactions were kept at Hunter's office, when considered as a whole, indicate that a search of Hunter's law office was warranted. Based on the information supplied, Magistrate Niedermeier had a "substantial basis" for concluding that evidence of the crime of money laundering would be found at Hunter's law office.

## B. *Residence search*

■ Hunter also contests the validity of the search because it invaded his home. Hunter maintained his law office in his home, as the Cole affidavit attests. There was reason to believe that it would be difficult to distinguish between the work space and the living space within the building. It became evident when the building was searched that there was no clear demarcation between the areas where work-related documents might be found and the rest of the house. Although most of Hunter's office equipment and files were located in the basement, somewhat separated from the rest of the house, there were files and a computer with accessories in the dining room area as well. The

agents did not search the entire house, but confined their search to the work-related areas they discovered within the house. There was probable cause to search Hunter's residence, based on the totality of the circumstances. *See National City,* 635 F.2d at 1024 (warrant which authorized search of suite of offices was not overbroad; space utilized by law office was commingled with business operation under investigation).

### C. *Nighttime search*

Magistrate Judge Niedermeier authorized execution of the search warrant at any time in the day or night. The federal rules permit a nighttime search only upon a demonstration of reasonable cause. Fed R. Crim. P. 41(c)(1).

■ Based on the totality of the circumstances, the Magistrate Judge was provided with reasonable cause for a nighttime search. The information in the affidavits indicated that pertinent records or documents concerning the alleged scheme between Hunter and Sargent were in Hunter's possession. Once Sargent and Merrill were arrested, agents feared that evidence concerning the scheme might be destroyed. The nighttime search was requested so that officers could retrieve evidence before Hunter became aware of the Sargent and Merrill arrests. Authorization for an immediate search was reasonable. *See United States v. Curry,* 530 F.2d 636, 637 (5th Cir.1976) (reasonable cause shown when suspects might move records the next day).

■ Moreover, even if the search warrant invalidly authorized a nighttime search, the agents relied in good faith on a facially valid warrant. Under the good faith exception to the exclusionary rule articulated in *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), objectively reasonable reliance on a subsequently invalidated search warrant will not result in exclusion of evidence.

### 3. Specific Items

In Hunter's Supplemental Memorandum of March 19, 1998, he argues that the government lacked probable cause to seize several items listed in Attachment C of the warrant.

First, according to Hunter, nothing in the affidavits provided probable cause to search his computers, disks, and similar property. There was no indication in the affidavits that computers were present, or that the records sought were maintained on computers.

Today computers and computer disks store most of the records and data belonging to businesses and attorneys. Probable cause existed to search for and seize the computer-related property because probable cause existed to search for the records concerning the individuals and entities listed in the other sections of the attachment. *See United States v. Gawrysiak,* 972 F.Supp. 853, 861 (D.N.J.1997) (approving warrant to search business office; government need not know the exact "form that records may take"). A finding of probable cause is not predicated on the government's knowing precisely how certain records are stored.

■ Second, Hunter objects to the probable cause determination for the "all documents" search under Sections II and III, especially for HEFA and the property at 60–62 Jarvis Street, Windsor, citing a lack of support in the affidavit. The propriety of an "all documents" search raises the issue of particularity more than probable cause; that problem is dispelled because "all documents" is tied to specific entities and properties. HEFA and 60–62 Jarvis Street are referred to and implicated in the alleged illegal dealings described by the supporting affidavits. The Magistrate Judge found probable cause justifying the seizure of those records; this Court concurs with those findings.

Third, Hunter challenges the time range of the records sought. The June 8, 1995 warrant asked for records extending back to January 1, 1992. Based on, *inter alia,* Sargent's representation that his relationship with Hunter had been ongoing for a couple of years, probable cause existed to search records within this span of time. Again, disputes over the time range go more to particularity and scope than probable cause. In this case, the limitation to less than three years of records was justified and does not pose any concerns of overbreadth.

### 4. Privacy Protection Act

██ Hunter invokes the Privacy Protection Act, 42 U.S.C. § 2000aa, and argues that it applies to the search here because Hunter published *Vermont Law Week* out of his law office. The Privacy Protection Act prohibits the government from searching for and seizing work product materials and other documents possessed by an individual engaged in public communication. 42 U.S.C. § 2000aa(a), (b). The Act excepts from this prohibition, however, these materials when there is probable cause to believe that the individual is committing or has committed a criminal offense to which the materials relate. 42 U.S.C.2000aa(a)(1), (b)(1). The Privacy Protection Act does not protect Hunter in this case because the government had reason to believe that he had committed a criminal offense, as discussed above, to which the seized materials related.

### II. General Warrant

██ The Fourth Amendment requires that a search warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. Am. IV. Subjects of a search may challenge the warrant's language as overbroad, or insufficiently particular. General warrants create a problem "not ... of intrusion *per se*, but of a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). To avoid being general, a "warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir.1992).

The search warrant authorized the seizure of two distinct categories of material from Hunter's law office: documents and records pertaining to specified individuals, entities and property; and all computers and computer storage devices.

### A. Documents and Records

Records searches are vexing in their scope, because invariably some irrelevant records will be scanned in locating the desired documents. Such searches spark protests over the amount of discretion given to the searching officers, and these concerns are heightened when the documents include potentially privileged legal materials. A warrant calling for a thorough records search does not necessarily give officers too much discretion, however. Although there are "grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers" as opposed to physical objects, it is accepted that in the course of a valid search "some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Andresen v. Maryland*, 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). Although care must be taken to "minimize[ ] unwarranted intrusions upon privacy," *id.*, records searches "permit[ ] officers to examine many papers," in recognition of "the reality that few people keep documents of their criminal transactions in a folder marked '[crime] records.'" *United States v. Riley*, 906 F.2d 841, 845 (2d Cir.1990).

██ Money laundering is the sort of crime which may involve copious documents. A warrant seeking records relating to money laundering transactions will necessarily be wide-ranging but must not be impermissibly general. Specifying the types of records sought, as was done in this case, avoids the risk of generality. "Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *Id.*

██ Thus in this case Sections II and III of Attachment C gave a list of examples of the particular records sought, and Section I restricted its scope to documents concerning financial transactions. In addition, each of these sections identified the records by time period and by the individual, entity, or property involved. These parameters more than adequately circumscribed the executing officers' discretion, and satisfied the particulari-

ty requirements of the Fourth Amendment. *See id.*, (no Fourth Amendment violation where category of seizable records was adequately described and accompanied by illustrative list); *United States v. Mankani*, 738 F.2d 538, 546 (2d Cir.1984) (no general warrant where terms authorized seizure of documents "pertaining to a specific fraudulent transaction and a specific piece of real estate").

█ The warrant did not authorize an unregulated rummaging through Hunter's records. However, because the search of his law office necessitated a cursory examination of records which were irrelevant, some of which may have been privileged, the government took steps to minimize its intrusion. The warrant application included a detailed set of instructions to the searching agents, to the AUSA, and to computer analysts, all designed to limit invasion of confidential or privileged or irrelevant material. *See National City*, 635 F.2d at 1026 (officers, having received memo of instructions and having been directed by U.S. Attorney, were not allowed too much discretion in searching through privileged documents). The screening procedure designed by the government was an adequate safeguard against the seizure of protected papers.[2]

### B. Computers and related devices and systems

Hunter contends that the warrant's authorization to seize all computer hardware and software and documentation violated the Fourth Amendment's particularity requirement. Section IV of Attachment C calls for the wholesale seizure of these items. The seizure of computer equipment is vulnerable to a particularity challenge. Computers store vast numbers of records, and access them cannot be obtained with the same ease as examining file folders in an office. Computer records are extremely susceptible to tampering, hiding, or destruction, whether deliberate or inadvertent. *See United States v. Abbell*, 963 F.Supp. 1178, 1199 (S.D.Fla. 1997). Often it is simply impractical to search a computer at the search site because of the time and expertise required to unlock all sources of information. *Id.*

█ The wholesale removal of computer equipment can undoubtedly disable a business or professional practice and disrupt personal lives, and should be avoided when possible. Still, until technology and law enforcement expertise render on-site computer records searching both possible and practical, wholesale seizures, if adequately safeguarded, must occur. At the very least, the government should copy and return the equipment as soon as possible. *See Steve Jackson Games, Inc. v. United States Secret Service*, 816 F.Supp. 432, 437 (W.D.Tex.1993) (owner of electronic bulletin board had computers and disks seized; court found no valid reason why information sought could not be copied and equipment returned within hours), *aff'd* 36 F.3d 457 (5th cir.1994).

Technological issues aside, computers also raise particularity concerns because of their versatility. With their unparalleled ability to store and process information, computers are increasingly relied upon by individuals in their work and personal lives. Computer searches present the same problem as document searches—the intermingling of relevant and irrelevant material—but to a heightened degree. *See* Raphael Winick, "Searches and Seizures of Computers and Computer Data," 8 Harv.J.L. & Tech. 75, 78 (Fall 1994) ("the massive storage capacity of modern computers creates a high risk of overbroad, wide-ranging searches and seizures"). For exam-

---

2. It may be preferable for the screening of potentially privileged records to be left not to a prosecutor behind a "Chinese Wall," but to a special master or the magistrate judge.

[R]eliance on the implementation of a Chinese Wall, especially in the context of a criminal prosecution, is highly questionable, and should be discouraged. The appearance of Justice must be served, as well as the interests of Justice. It is a great leap of faith to expect that members of the general public would believe any such Chinese wall would be impenetrable; this notwithstanding our own trust in the honor of an AUSA.

*In Re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994). *See also United States v.. Neill*, 952 F.Supp. 834, 841 (D.D.C.1997) (expressing preference for "more traditional alternatives of submitting disputed documents under seal for in camera review by a neutral and detached magistrate or by court-appointed special masters").

584

ple, confidential personal or legal matters irrelevant to the search may not be easily separated from relevant records because the file titles may not clearly distinguish the two.

There is no justification for favoring those who are capable of storing their records on computer over those who keep hard copies of their records, however. Computer records searches are no less constitutional than searches of physical records, where innocuous documents may be scanned to ascertain their relevancy. *See Abbell,* 963 F.Supp. at 1200 (reviewing seizure of computers and records from law office; seizure of items outside the warrant was inevitable, but not unconstitutional).

Although computer searches are not per se overbroad, each case must be independently evaluated for lack of particularity. Improper seizure of items will normally result in their return and in exclusion of the item as evidence at trial, rather than invalidation of the search, however. *See National City,* 635 F.2d at 1026.

The government, facing what was in this district a novel situation, devised a plan to ensure that all relevant computer records were retrieved without undue intrusion into records beyond the scope of the search. The warrant application included the instructions to the searching agents, to the AUSA monitoring the search, and to the computer analysts who would eventually examine the electronic information. The instructions stressed the necessity of remaining within the scope of the warrant.

Unfortunately for the government's plan, the warrant itself was defectively composed. Attachment C described the property to be searched. Computer disks were included in the illustrative list for Sections II and III; those disks were appropriately particularized. All other computers and related equipment, however, were listed in Section IV, without limitation and without reference to the limitations in the other sections. Section IV did not indicate the specific crimes for which the equipment was sought, nor were the supporting affidavits or the limits contained in the searching instructions incorporated by reference.

Section IV simply called for the seizure of "[a]ll computers ... [a]ll computer storage devices ... [and a]ll computer software systems," detailing only examples of what types of computer paraphernalia were included. (Paper 5, Att. C.) This section is a catch-all paragraph, which lacks sufficient limitation. *Compare Andresen,* 427 U.S. at 479–80, 96 S.Ct. 2737 (phrase seeking all evidence was not general because modified by sentence referring to specific crime) *with George,* 975 F.2d at 75 (where warrant authorized search for "any other evidence relating to the commission of a crime" without restriction, phrase was overbroad and allowed officers too much discretion).

To withstand an overbreadth challenge, the search warrant itself, or materials incorporated by reference, must have specified the purpose for which the computers were seized and delineated the limits of their subsequent search. Section IV was insufficiently particularized, and all computer equipment and disks seized under that paragraph were taken in violation of the Fourth Amendment's particularity requirement. *See United States v. Kow,* 58 F.3d 423 (9th Cir. 1995) (warrant authorizing seizure of all computers overbroad).

However, a seizure pursuant to insufficiently particular language in a warrant does not inexorably result in suppression of the evidence. The "good faith" exception to the exclusionary rule applies when officers seize evidence in good faith based on a warrant which is subsequently ruled invalid. *George,* 975 F.2d at 77, *citing Leon,* 468 U.S. at 919–921, 104 S.Ct. 3405. The United States Supreme Court recognized that in some circumstances "a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officer cannot reasonably presume it to be valid." *Id.,* 468 U.S. at 923, 104 S.Ct. 3405. The good faith exception will apply if it was objectively reasonable for the agents conducting the search to rely on the warrant's authorization to seize all computers.

The Court notes that the agents and attorneys involved devised a comprehensive

plan for the seizure and search of the items listed in the warrant. Instructions were drawn up for the executing officers, for the computer analysts at the FBI who were to find and copy the relevant records, and for the AUSA, who would then examine the copied records for privileged material. These instructions were included in the search warrant application, and informed the magistrate judge's evaluation of the warrant's validity. The instructions and the evidence before the Court are convincing proof of the government's intention to search computers and storage devices only for the records as particularized in the first three sections of Attachment C. There is no indication that the government in fact sought the wholesale seizure of computer equipment so that every file could be scrutinized, for evidence of any violation of the law.

Without incorporation of the instructions or reference to the other sections, Section IV was impermissibly overbroad, but the government operated as though Section IV was limited by the first three sections. This is one of the sorts of situations that *Leon*'s good faith exception was intended to cover. *See Massachusetts v. Sheppard,* 468 U.S. 981, 990–91, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) (exclusionary rule did not apply when officer reasonably relied on warrant subsequently found to contain clerical errors which rendered it insufficiently particular). Suppression of any evidence obtained pursuant to Section IV of Attachment C is not warranted.

### III. *Execution of Warrant*

Hunter adds to his arguments a claim that the search was improperly carried out. The search of the Hunter residence and office was to be performed according to the protocol submitted to the magistrate judge. After the warrant was authorized, a meeting was held with all participating officers to review this plan. Hunter claims and the government concedes that, despite the written plan's provisions to the contrary, the DEA investigating agents were present inside the Hunter home during the execution of the search. Hunter alleges further that these agents in fact participated in the search.

A search pursuant to a valid warrant may nevertheless result in suppression of the evidence obtained if the search was conducted with flagrant disregard for the warrant's terms. *United States v. Matias,* 836 F.2d 744, 747 (2d Cir.1988) (citing cases). Here, DEA investigating agents did enter the Hunter residence and remain inside during the search, in violation of the express terms of the searching instructions, which were not appended to the warrant. The Court is not persuaded that the search team or the DEA agents deliberately flouted the terms of the warrant. The DEA agents did not play a substantial role in the search or review of documents. At most, the two agents questioned Hunter in an effort to establish whether certain records were subject to seizure pursuant to the warrant, one agent assisted in the security sweep of the building, and one agent opened computer files at the AUSA's direction, to enable Hunter to retain those files. The agents should not have been present if the protocol required their absence, but the agents did not participate in such a way as to show flagrant disregard for the warrant. *See Neill,* 952 F.Supp. at 838 n. 8 (challenge to presence of member of prosecution team failed; no evidence that agent reviewed or discussed documents with seizing agents); *Abbell,* 963 F.Supp. at 1199–1200 (agents' failure to follow certain of their own search procedures bordered on the objectionable, but did not present constitutional problems).

Hunter also claims that agents seized items outside the scope of the warrant, making him the victim of a general warrant. That records beyond the warrant's scope were seized does not doom the constitutionality of the search. Agents sorted through many files at the office in search of those within the warrant's scope. If items outside the scope of the warrant were seized, the remedy is exclusion of those items as evidence at trial. The propriety of the search or the evidence obtained therefrom remains unaffected, however, absent flagrant disregard. *See id.,* at 1200–01. No flagrant disregard has been shown in connection with any seizure of evidence beyond the warrant's scope.

**586**

## IV. *Inevitable Discovery*

The government argues in the alternative that Hunter's motion to suppress must be denied because the seized records would inevitably have been disclosed to the government when Hunter complied with a grand jury subpoena which demanded essentially the same materials. The Court, having found that Hunter does not prevail on any of his suppression arguments, need not address the applicability of the inevitable discovery exception to the exclusionary rule.

## V. *Conclusion*

For the foregoing reasons, Hunter's Motion to Suppress Evidence Seized June 9, 1995 and Any Fruits Thereof (Paper 47) is DENIED.